**E-FILED**
Friday, 09 October, 2015  02:51:34 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

WILLIAM O. CLOTFELTER,           )
                                 )
    Plaintiff,                   )
                                 )
    v.                           )           NO. 12-3186
                                 )
CAROLYN W. COLVIN,               )
COMMISSIONER OF SOCIAL           )
SECURITY,                        )
                                 )
    Defendant.                   )

## OPINION

RICHARD MILLS, U.S. District Judge:

Pending before the Court are the Plaintiff's Motion for Summary Judgment and the Defendant's Motion for Summary Affirmance.

## I. INTRODUCTION

Plaintiff William Clotfelter was born in November of 1961.  The Plaintiff applied for Disability Insurance Benefits in April of 2010, alleging disability beginning on February 22, 2006, due to complications from a neck injury and surgery and depression.  His application was denied initially and upon reconsideration.

A video hearing was held before an Administrative Law Judge (ALJ) on January 4, 2011.  The Plaintiff was represented by a non-attorney representative and testified.  George Paprocki, a vocational expert (VE), also testified.  On January 18, 2011, the ALJ found that Plaintiff was not disabled because he was able to perform a significant number of jobs in the national economy.

The ALJ's decision became the Commissioner's final decision when the Appeals Council denied the Plaintiff's request for review.  The Plaintiff seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II. BACKGROUND

The Plaintiff did maintenance work from 1989 to 2006.  The job involved doing repairs and maintenance on commercial properties.  The Plaintiff did routine maintenance and preventative maintenance, in addition to whatever repairs were needed.  He completed reports on repairs performed, inventory reports and budget reports.  The Plaintiff was a lead worker and supervised three people.

The Plaintiff stated he was injured on the job on August 23, 2005. He was off of work for a few days and returned to the same job, except he did not do physical work. Instead, he supervised the staff and did desk work. The Plaintiff stopped working on February 22, 2006 to undergo surgery. He was off until some point in June of 2006 when he returned to work, before stopping again on July 31, 2006.

### III. PLAINTIFF'S STATEMENTS AND TESTIMONY

On February 22, 2006, the Plaintiff underwent neck fusion surgery to repair discs. The Plaintiff testified that he initially made good progress and the surgery relieved some of his problems. He went back to school from January to December of 2007. Although he had some problems, the Plaintiff was able to do his school work. The Plaintiff thought he could perform work as an inspector but reported he could not find a position because the housing market had crashed.

In March of 2008, the Plaintiff moved back to Illinois from Las Vegas and looked to get back to his old line of work doing repairs and maintenance, but found he could not meet the physical requirements.

Ibuprofen helped the Plaintiff's pain.  He testified that any reaching or exertion aggravated his neck, hand and arm condition.  The Plaintiff testified that when he woke up in the morning, he had difficulty getting his arms and hands to function.  His neck and arms felt better if he got in a reclined position and was able to prop up his neck in a certain position. Heat and ice also helped on occasion.

The Plaintiff further testified that he suffered pain in his lower back which radiated into his hips.   The pain became an everyday occurrence–sometimes mild and other times severe.  Bending, stooping and walking any distance made the pain more severe.  Some relief was obtained by lying in a reclined position with something propped under the Plaintiff's lower back, using a heating pad, or getting the stress off his lower back.  In a report to the agency, the Plaintiff stated he tried not to lift over ten pounds due to pain.  The Plaintiff reported that at times, he had difficulty walking more than 40 feet and sitting for more than 30 minutes.

The Plaintiff testified that his knee occasionally popped out of place, perhaps due to an old high school injury.  This would result in severe pain.

4

At the end of October of 2010, he twisted his knee. The Plaintiff stated his knee was currently in a brace. The pain would worsen if he was on his knee for too long, walked a long distance or sat in certain positions. The Plaintiff testified that Epsom salt baths and ice would help the knee pain. He reported he would soon be starting physical therapy.

The Plaintiff also testified that after having problems with hand swelling and pain, he was diagnosed with arthritis and tendinitis. For three to four days about once a month, he could barely make a fist and hardly grasp.

The Plaintiff further testified he suffered from depression. He was not then nor had he ever been on medication for depression. The Plaintiff had never been in therapy or gone to counseling for depression. The Plaintiff reported a number of symptoms that are often associated with depression.

The Plaintiff testified he lived in an apartment with a roommate. He was able to drive. The Plaintiff testified his activities included taking care of his personal needs, making coffee, performing some household chores, watching television, reading, shopping and running errands. The Plaintiff

also reported living with two dogs and two cats.  The Plaintiff stated that, when he ran out of food for his pets, a friend would let him work at a local truck stop in exchange for food for himself and his animals.

The Plaintiff testified that he did not like to deal with people. Although he used to go out with others for coffee, the Plaintiff stated he no longer did that.  The Plaintiff stated he saw his son, who lived in Colorado, once every three to four years.  The Plaintiff also has a daughter with whom he has no relationship.

The Plaintiff testified he could lift eight pounds comfortably and maybe ten to twelve pounds occasionally.  He could stand for an hour, sit for half and hour to 45 minutes before he had to change positions and move around, and could walk about one block.  The Plaintiff had problems doing anything overhead and trying to get down on the floor and get back up was difficult.

The Plaintiff testified he did not have medical coverage and had only recently seen doctors for his medical issues.  The Plaintiff stated doctors recently told him that his use of ibuprofen may have contributed to his high

blood pressure.

## IV. MEDICAL EVIDENCE

Prior to the Plaintiff's alleged onset date, he had undergone hand surgery.  In August of 2005, the Plaintiff injured his neck while working. He was diagnosed with cervical strain, thoracic strain and bilateral hand numbness.   The Plaintiff continued to experience neck pain with intermittent medial scapular radiation with extension down his upper extremities.

On February 14, 2006, the Plaintiff saw Jason Garber, M.D. at Western Regional Center for Brain & Spine Surgery.  Upon examination, the Plaintiff experienced subjective weakness in his upper extremities and had limited neck motion.  An MRI of the cervical spine revealed a large left paracentral disc herniation at C5-6 and C6-7 and contusion within the cord at the left of the C5-6.  Dr. Garber recommended an anterior cervical discectomy and fusion at C5-6 and C6-7.  The Plaintiff's preoperative diagnosis was herniated cervical disc, C5-6, C6-7, with cord compression and cervical myeloradiculopathy and neurologic deficit.

On February 22, 2006, Dr. Garber performed an anterior cervical discectomy C5-6, and C6-7.  On March 21, 2006, Dr. Garber reported that Plaintiff was doing quite well and was "relatively asymptomatic."  The X-rays revealed good position of metal and bone with interbody grafts and the anterior plate and screws were in good position.  The Plaintiff's neurological exam was nonfocal.  The Plaintiff was given a prescription of physical therapy and refill of pain medication.  On May 23, 2006, Dr. Garber noted that Plaintiff could return to light duty and sedentary duty work for four hours a day.

A June 8, 2006 CT revealed an anterior fusion involving C5, C6 and C7 with unremarkable bony alignment; congenital canal stenosis about the cervical region, most pronounced in the mid-to-upper extent of the cervical spine; C5-6 left parasagittal posterior osteopyhtic spur encroaching upon the spinal cord; and mild to moderate bony stenosis of the right C4-5 neural foramen.

On July 18, 2006, Dr. Garber noted that Plaintiff was doing "quite well after surgery, even though he recently had suffered a setback due to a

motor vehicle accident, in which the Plaintiff sustained a whiplash-type injury.  On August 15, 2006, Dr. Garber reported that Plaintiff's x-rays revealed good position of metal and bone with interbody grafting and his anterior plate and screws were in good position.  There was no evidence of hardware failure.  He opined that Plaintiff had reached maximum medical improvement and was doing "relatively well."

On September 19, 2006, Dr. Garber noted that Plaintiff appeared after a Functional Capacity Evaluation (FCE).  The Plaintiff's tests were valid and he had been given light-to-medium work duty activities.  Dr. Garber believed that Plaintiff was capable of doing such work and he was allowed to return to work per his FCE.

On July 14, 2010, Vittal Chapa, M.D., performed a consultative evaluation of the Plaintiff.  Dr. Chapa reviewed the Plaintiff's cervical spine x-ray and Dr. Garber's September 19, 2006 report.   The Plaintiff complained of neck pain radiating into his shoulders and upper extremities and numbness/tingling in his hands.  He also reported low back pain, which radiated into both hips.  The Plaintiff complained of a pins and needles

sensation and pain in his feet.  The Plaintiff advised he could not do any overhead type of work.  He stated he could not perform daily activities like washing the dishes and cleaning the house and could not walk far or sit very long.  The Plaintiff reported that his symptoms had worsened the last two years.  He took 1600 to 3000 milligrams of ibuprofen each day for pain.  On examination, the Plaintiff was able to bear weight and ambulate without any aids.  He walked with an antalgic gait and walked slowly and bent forward.  There was no specific muscle weakness or muscle atrophy.  The Plaintiff was able to appreciate pinprick sensations to both his upper and lower extremities.  The Plaintiff had moderate paravertebral muscle spasms.  For his grip, the Plaintiff received 5/5 for both hands and he could perform both fine and gross manipulations with both hands.  Dr. Chapa noted that, subjectively, the Plaintiff's lumbosacral spine flexion was limited.  His straight leg raising, while sitting, was negative to 80 degrees bilaterally.  When the same test was performed in the supine position, the Plaintiff could hardly raise his legs off of the exam table.  Dr. Chapa found the findings were not consistent.  The Plaintiff had a full range of motion of

both the hips and knees but subjectively had decreased range of motion of the cervical spine and both shoulders.  Dr. Chapa diagnosed status post cervical fusion and chronic lumbosacral and cervical pain syndrome.

On August 2, 2010, Dolores Trello, Psy.D., evaluated the Plaintiff. She found the Plaintiff to be very forthcoming.  The Plaintiff did what he could to provide for his four pets.  He performed odd jobs, such as installing a thermostat for a neighbor.  The Plaintiff's memory seemed intact.  He was able to repeat six numbers forward and five numbers backward.  He was well-informed and had no difficulty performing mathematical calculations.  The Plaintiff was able to provide abstract meanings for proverbs, was well-oriented and provided solutions to hypothetical situations.  Dr. Trello found that Plaintiff did well on his mental status examination.  Dr. Trello assessed the Plaintiff with a depressed mood associated with chronic pain and medical conditions, an adjustment disorder with depressed mood due to stressors, and assessed a Global Assessment of Functioning (GAF) score of 50.[1]

---

[1]A GAF score of 50 is indicative of serious symptoms or any serious impairment in social, occupational or school functioning.   See American

On August 9, 2010, Terry Travis, M.D., a State agency medical consultant reviewed the record evidence and opined that Plaintiff did not have a severe mental impairment.  Dr. Travis considered Dr. Trello's evaluation and other sources.  Dr. Travis noted that Plaintiff was "passively suicidal" and found that any impairment related to a mental disorder was not severe.

On August 10, 2010, Reynaldo Gotanco, M.D., a State agency physician, reviewed the medical record and opined that Plaintiff could perform light exertional work.  Dr. Gotanco found that because of the Plaintiff's cervical history, he was limited to occasional pushing and pulling with his upper extremities.  He opined that Plaintiff could never climb ladders/ropes/scaffolds and the Plaintiff could occasionally climb ramps/stairs, balance, stoop, kneel, crouch and crawl.  Dr. Gotanco found the Plaintiff was limited to occasionally reaching overhead with his upper extremities.

On September 16, 2010, Towfig Arjmand, M.D., reviewed the

Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) at 34.

evidence and affirmed Dr. Gotanco's opinion.

On October 28, 2010, the Plaintiff went to the emergency room complaining of knee pain.  He stated he was getting up from the ground and his upper leg went one way and the lower leg another way.  On exam, he had tenderness to palpation midline superior and interior to patella and he was unable to flex his knee past 120 degrees.  The Plaintiff had full extension, no swelling and strong pedal pulses.  The Plaintiff was diagnosed with a knee strain and discharged.  He was told not to bear weight until he was reevaluated.

On December 4, 2010, the Plaintiff was seen at Capitol Community Health Center for knee pain.  He was assessed with a knee sprain.  On December 16, 2010, the Plaintiff was seen at SIU HealthCare Division of Orthopedic Surgery for his right knee pain.  On exam, the Plaintiff walked somewhat slowly but did not have antalgic.  The Plaintiff's knee was in an immobilizer and when he took that off, he walked without trouble.  He was given an injection and much of his pain went away.  It was noted that therapy might be needed.

## V. VE TESTIMONY

At the hearing, the ALJ asked the VE to assume an individual of the Plaintiff's age, education, and work history with the following limitations: the ability to lift and carry ten pounds occasionally and less than ten pounds frequently, to stand 30 to 45 minutes at a time, to sit 30 to 45 minutes at a time, and to walk one block at a time, all throughout an eight-hour day with a sit/stand option.  Additionally, the individual would have the ability to occasionally push and pull within those weight limits, occasionally climb ramps and stairs, occasionally balance, stoop, kneel, crouch and crawl and reach, but never perform any overhead reaching.  The individual would be unable to climb ladders, ropes or scaffolding and could not do work involving hazards such as dangerous machinery or unprotected heights, or walk over uneven surfaces and the individual could have only occasional work interaction with co-workers, supervisors and the general public.  The VE testified the Plaintiff would not be able to perform his past work.

The ALJ then asked the VE if there were other jobs in the economy

that could be performed with those limitations.  The VE testified that, based on the Plaintiff's education and transferable skills from his previous work, there would be the following jobs available: a reviewer (DOT 209.687-018); a checker II (DOT 209.687-010), and a sorter (DOT 209.687-022), and there were about 5,000 such jobs in Illinois and about 250,000 in the United States.  Additionally, the individual could work as a service clerk (DOT 221.367-082), and there were about 750 such jobs in Illinois and 25,000 in the United States.  The VE testified these jobs were all skilled.

The VE further testified that even without considering the transferable skills, the individual could perform unskilled work as an electronics tester (DOT 726.684-026) and electronics inspector (DOT 726.684-022).  Those jobs in combination amount to approximately 900 jobs in the Illinois region, and 32,000 in the nation.

Additionally, the VE testified such an individual could perform unskilled work as a lampshade assembler (DOT 739.684-094) and fishing reel assembler (DOT 732.684-062).  These jobs are representative of a

longer list of unskilled and sedentary jobs, of which there are about 4,000 positions in Illinois and 150,000 in the United States.

The VE further testified that, if additional limitations of frequent use of the upper extremities for fine or gross manipulation and no work interaction with the general public were added, those limitations would not change his previous answers.  Additionally, if a limitation to the need for goal-oriented work rather than production-oriented work was also added, the VE stated such an individual could still work as a document-preparer (DOT 249.587-018) and an addresser (DOT 209.587-010).  There were about 4,000 such jobs in Illinois and 250,000 in the nation.

When asked to consider an individual who was off task 20 percent of the day or missed two days or more per month, the VE stated it would preclude competitive employment.

The Plaintiff's representative then asked the VE whether the jobs including those of the reviewer, sorter and clerk could be performed with only occasional reaching.  The VE testified that he had not understood the ALJ's original hypothetical as including such a limitation and, with that

limitation, none of the jobs he identified would be available.  The ALJ then asked the VE whether a limitation to frequent reaching would allow performance of all the jobs.  The VE answered affirmatively, as long as the limitation included no overhead reaching.

The ALJ asked the VE whether his testimony was consistent with the DOT and he stated that the DOT did not address sit/stand opinions but his testimony was based on experience.

## VI. DISCUSSION

### A. Standard of review

Pursuant to section 205(g) of the Social Security Act, the ALJ's decision must be upheld if it is supported by substantial evidence.  See Moore v. Colvin, 743 F.3d 1118, 1120 (7th Cir. 2014).  "Substantial evidence" includes "such relevant evidence as a reasonable mind accepts as adequate to support a conclusion."  Id. (citations omitted).  The ALJ's decision must include a "logical bridge from the evidence to the conclusions sufficient to allow . . . a reviewing court[] to assess the validity of the agency's ultimate findings and afford [the Plaintiff] meaningful judicial

review."  Id.

B. ALJ's Decision

The ALJ found that Plaintiff had not engaged in substantial gainful activity since February 22, 2006.[2]  She determined that, pursuant to 20 C.F.R. § 404.1520(c), the Plaintiff has the following severe impairments: status post cervical spine fusion surgery, knee pain, low back pain, and depression.  The ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ further found that Plaintiff had the residual functional capacity (RFC) to perform sedentary work, except he could stand for 30 to 45 minutes at one time, and walk for one block at a time throughout an eight-hour day, while requiring a sit/stand option.  Additionally, the Plaintiff was unable to climb ladders, ropes, or scaffolding, or work near

---

[2]The Plaintiff requested an amended onset date of March 31, 2008.  The ALJ did not amend the onset date.  Because she considered the time period from the Plaintiff's original alleged onset date of February 22, 2006 through the date of her decision, however, the ALJ considered the relevant time period at issue, whichever date was listed as the Plaintiff's onset.

hazards such as dangerous machinery or unprotected heights.  He could not walk over rough or uneven surfaces.  The Plaintiff could frequently reach, though not overhead.  The Plaintiff was limited to occasional climbing on ramps or stairs, balancing, stooping, kneeling, crouching and crawling.  He could have occasional work interaction with coworkers and supervisors but none with the general public.

Although the Plaintiff was no longer able to perform his past relevant work pursuant to 20 C.F.R. § 404.1565, the ALJ found that based on his age, education, work experience and RFC, the Plaintiff was not disabled because he could perform a significant number of jobs in the national economy.

C. Analysis

(1)

The Plaintiff contends that the VE testified he could perform no jobs if there was a limitation to occasional reaching.  Although this is true, the ALJ found that Plaintiff was limited to frequent reaching, not occasional reaching.  All of the jobs the VE testified about would be available if the

Plaintiff was limited in that manner.  Thus, the issue is whether the ALJ's finding that Plaintiff was limited to frequent reaching was reasonable.

The Court concludes that the ALJ's finding on the issue was reasonable.  The ALJ's finding is supported by the report of Dr. Chapa, in addition to the opinions of Dr. Gotanco and Dr. Towfig.  Accordingly, the ALJ's finding that Plaintiff could frequently reach, while not reaching overhead, is supported by substantial evidence.

Additionally, the Court finds no error in the ALJ's decision in crediting other aspects of Dr. Chapa's report.  The ALJ noted there were certain inconsistencies with some of the Plaintiff's subjective statements and the objective findings.  The record shows that the ALJ considered the Plaintiff's complaints and gave him the benefit of the doubt in some respects in determining his limitations regarding his abilities to stand, sit, walk, climb, stoop, kneel, crouch, crawl and reach overhead.  The Court concludes it was reasonable for the ALJ to consider Dr. Chapa's findings and other record evidence in assessing the Plaintiff's RFC.

The Court further concludes that substantial evidence supported the

ALJ's findings regarding the Plaintiff's mental health and ability to function.  Based on all of the medical evidence, it was reasonable for the ALJ to give little weight to Dr. Trello's GAF score of 50 because that was inconsistent with much of the other medical evidence from Dr. Trello and other sources.  As the ALJ noted, the Plaintiff took care of his personal needs, cared for his four pets, drove, performed some household chores, prepared food, watched television, read, shopped and ran errands.  There was no other objective evidence which was consistent with a GAF score of 50.  Accordingly, the ALJ's rejection of Dr. Trello's assessment of the Plaintiff as having a major mood disorder and a GAF of 50 was reasonable.

(2)

The record shows that the ALJ posed a number of hypotheticals to the VE.  Some of the ALJ's questions incorporated the Plaintiff's subjective statements concerning the extent of his symptoms.  The Plaintiff's assertion that the ALJ erred in finding that some of these symptoms and limitations were not credible is not persuasive.

The ALJ's decision as to a claimant's credibility "must contain specific

reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Zurawski v. Halter, 245 F.3d 881, 888 (7th Cir. 2001) (quoting SSR 96-7p) (quotation marks omitted). As long as the ALJ's findings are "reasoned and supported," it will not be found to be "patently wrong" and warranting reversal. See Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008) (citations omitted).

The ALJ provided support for her ruling in this case. She considered the credibility of the Plaintiff's complaints in addition to the objective medical evidence, the medical opinions, the Plaintiff's activities and treatment, and reasonably found that Plaintiff's allegations of disabling symptoms and limitations were not fully credible. Because the ALJ considered the Plaintiff's subjective complaints and provided objective medical reasons if she did not find them to be credible, the Court has no basis to reject the ALJ's credibility finding.

(3)

The Court further finds that the ALJ did not err in considering and crediting the VE's testimony that Plaintiff had transferable skills of doing paperwork and scheduling and, further, that there were a significant number of such jobs in Illinois and the national economy.

Additionally, the VE's testimony as to the number of available jobs with a sit/stand option was based on his expertise.  Accordingly, it was not error for the ALJ to rely on that testimony.

The Court further finds that Plaintiff's assertion that the ALJ was biased has no basis in the record.  It is the ALJ's duty to ask the VE questions in order to develop the record.  There is no requirement that the ALJ only ask hypothetical questions which incorporate the Plaintiff's self-reported symptoms.  The ALJ may also ask questions pertaining to other limitations if there is a basis in the record.  See Liteky v. United States, 510 U.S. 540, 555 (1994) (noting that "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or

partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible").

Because there was evidence in the record supporting a limitation as to frequent reaching, it was reasonable for the ALJ to make such a finding. The Plaintiff's assertion of bias is not supported by the record.

D. Conclusion

The Court has considered all of the Plaintiff's arguments and finds no basis to disturb the ALJ's decision.  For the reasons stated herein, the Court concludes that the ALJ's decision is supported by substantial evidence.

Ergo, the Plaintiff's Motion for Summary Judgment [d/e 10] is DENIED.

Pursuant to Rule 25 of the Federal Rules of Civil Procedure, Carolyn W. Colvin, as Acting Commissioner of Social Security, is hereby automatically substituted as the Defendant in this suit.

The Defendant's Motion for Summary Affirmance [d/e 12] is ALLOWED.

The Commissioner's decision is Affirmed.

24

The Clerk will enter Judgment and terminate this case.

ENTER: October 8, 2015

FOR THE COURT:

s/Richard Mills
Richard Mills
United States District Judge